UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BERYL STODDARD,     :
           :CIVIL ACTION NO. 3:16-CV-1591
    Plaintiff,   :
           :(JUDGE CONABOY)
     v.     :
           :
NANCY A. BERRYHILL,[1]   :
Acting Commissioner of   :
Social Security,     :
           :
    Defendant.   :
           :

_____

## MEMORANDUM

Pending before the Court is Plaintiff's appeal from the

Commissioner's denial of Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act and Social Security

Income ("SSI") under Title XVI.  (Doc. 1.)  Plaintiff filed

applications for these benefits on January 30, 2009, alleging a

disability onset date of March 13, 2007.  (Doc. 16. at 1.)

Administrative Law Judge ("ALJ") Sharon Zanotto issued her original

unfavorable decision on November 16, 2010, and following

Plaintiff's appeal of the decision, the Appeals Council remanded

_____

  [1]  Nancy A. Berryhill is now the Acting Commissioner of Social
Security.  Pursuant to Rule 25(d) of the Federal Rules of Civil
Procedure which addresses the substitution of parties when a public
officer is replaced, Nancy A. Berryhill should be substituted for
Acting Commissioner Carolyn W. Colvin as the defendant in this
suit.  Fed. R. Civ. P. 25(d).  No further action needs to be taken
to continue this suit by reason of the last sentence of section
205(g) of the Social Security Act, 42 U.S.C. § 405(g), which states
that "[a]ny action instituted in accordance with this subsection
shall survive notwithstanding any change in the person occupying
the office of Commissioner of Social Security or any vacancy in
such office."

the case to ALJ Zanotto in an Order dated June 26, 2012. (*Id.* at 1-2 (citing R. 207).)  The Appeals Council specifically directed the ALJ regarding certain issues deemed inadequate in her decision (which will be discussed below) and generally directed her to do anything else necessary to complete the claim.  (R. 207-10.) Following two additional hearings (R. 82-188) and another unfavorable Decision on March 1, 2013 (R. 11-27), Plaintiff again sought Appeals Council review (R. 7-10) which was denied on July 1, 2016 (R. 1-6).  With the Appeals Council denial, the ALJ's decision became that of the Acting Commissioner.  (R. 1.)

Plaintiff filed this action on August 1, 2016 (Doc. 1), asserting in her supporting brief that the ALJ erred on the following bases: 1) the ALJ made the same findings in her second decision as she made in her first decision and failed to follow the instructions of the Appeals Council; 2) the ALJ failed to follow the treating physician rule regarding the opinion of Gene Huang, M.D.; and 3) the ALJ erred in finding that Plaintiff and her husband were not credible (Doc. 16 at 12-13).  After careful review of the record and the parties' filings, the Court concludes this appeal is properly denied.

## I. Background

Plaintiff was forty-seven years old as of her disability onset date.  (R. 381.)  She has a high school education (GED) and past relevant work as a mail clerk.  (R. 74, 426-27, 540.)  Plaintiff

reported that her panic attacks/anxiety, depression, and fear of going out in public limited her ability to work because she had difficulty concentrating, medicine made her sleepy, she got nervous around a lot of people, and she was afraid to go out in public. (R. 433-34.)

## 1.   **Medical Evidence**

Records show that Plaintiff was referred to Eugene Huang, M.D., of York Health Behavioral Health Services because of panic attacks in 2000.  (R. 539-41.)  Many Progress Notes presumably from Dr. Huang/Wellspan Behavioral Health are difficult to decipher and/or do not indicate the year the note was generated.  (R. 490-538.)  Relying in some instances on the parties' interpretations of relevant records, it appears that within the year before the alleged onset date, Plaintiff reported to an Adams-Cumberland Family Medicine provider that she was doing well despite taking care of her ailing parents and husband who had chronic back pain. (R. 551.)  She said she was under a lot of stress dealing with her children's problems and Paxil "really decreased her anxiety attacks." (*Id.*)  Defendant points to evidence which shows that Plaintiff continued to take Trazadone, Paxil, and Klonopin between March 2007 and April 2011 and Dr. Huang increased and decreased the dosages as needed.[2]  (Doc. 19 at 5 (citing R. 554-57, 600-05, 611-

---

[2]   In her reply brief, Plaintiff asserts that Defendant's brief contains errors of fact and law.  (Doc. 21 at 1.)  Evidence cited in the Background section of the Memorandum has not been

14).)   Defendant adds that

> [m]edications generlly controlled her
> symptoms of anxiety, panic attacks,
> agoraphobia, periodic depression, and
> sleeping difficulties (Tr. 493, 556-57, 602-
> 03, 611, 614).  Dr. Huang's treatment notes
> indicate that Plaintiff last reported a panic
> attack in July 2007 (Tr. 490-94, 554-57, 600-
> 05, 611-14).  Thereafter, Plaintiff
> repeatedly reported no panic attacks or
> agoraphobia (Tr. 490-92, 556-57, 602, 611),
> was able to go out in public alone or
> accompanied (Tr. 603, 611), attended a large
> gathering for her daughter's wedding (Tr.
> 557), and was able to travel (Tr. 611).  Dr.
> Huang also recommended therapy, but Plaintiff
> never pursued that option (Tr. 492).
>
> On examination, Plaintiff's mood and
> affect varied between depressed, nervous, or
> irritable (Tr. 490, 556, 601, 605, 613), and
> "ok," even, or brighter (Tr. 491, 555-57,
> 600, 603, 611).  Plaintiff was angry once,
> but otherwise was noted as having a
> cooperative attitude (Tr. 600-01, 611-13).

(Doc. 19 at 6.)

Plaintiff points to June 2009 office notes from Adams-
Cumberland Family Medicine where Plaintiff reported to Orville G.
McBeth, M.D., that she had two significant panic attacks the
previous month.  (Doc. 16 at 10 (citing R. 615).)  At the time,
Plaintiff said she did not know what caused the attacks where she
had shaking, crying, and could not sit still, and, although
medication helped with minor attacks, she just had to "ride it out"
for major attacks.  (R. 615.)

---

specifically challenged in Plaintiff's reply brief.

June 14, 2011, Adams-Cumberland office visit notes indicate Plaintiff felt her anxiety problem was controlled, she was compliant with medication and treatment recommendations, and she was tolerating the medications well without side effects.  (R. 623.)  Provider David L. Wampler, M.D., noted that Plaintiff's psychiatrist was leaving and she wanted him to assume control of her medications.  (*Id.*)  The next office visit of record was June 20, 2012, at which time Plaintiff continued to report to Dr. Wampler that her anxiety problem was controlled, she was following her treatment regimen, and she had no medication side effects.  (R. 630.)  On January 11, 2013, Plaintiff was see by Linda Miller, CRNP, of Adams-Cumberland and was diagnosed with pneumonia.  (R. 664.)  Plaintiff's mental health problems were not addressed at the visit.  (See R. 664-65.)

## 2.   **Opinion Evidence**

*a.   Examining Psychologist*

On June 6, 2009, Thomas G. Bowers, Ph.D., evaluated Plaintiff's mental status and completed a Medical Source Statement. (R. 559-65.)  He noted that Plaintiff's chief complaints were panic attacks and depression; she said the last panic attack she had on May 25, 2009, resulted in crying, shaking, and similar difficulties.  (R. 559.)  Plaintiff told Dr. Bowers she had been fired in part "because of her mental illness," she had difficulty being around other people in the city because she "often becomes

5

confused and cannot think clearly," and she felt depressed "from time to time." (*Id.*)

Dr. Bowers noted that Plaintiff's mood "seems to be problematic in terms of her sleep," describing a sleep pattern where she got about seven hours of sleep per night, but she often had nightmare and tossed and turned in her sleep. (R. 560.) He found her intellect to be reasonable, her approach to abstract thinking fair with a very good response to proverbs, and she was oriented in all spheres though she admitted that she got confused about days from time to time. (R. 561.) Plaintiff described her memory as being "not good" and it appeared "quite weak" on formal testing. (R. 561.) He explained that

> her working short-term memory was quite limited, and she only repeated five digits forwards and four digits backwards, which is very low, even allowing for her limited education. On the other hand, she managed to acquire a short list of eight words over three trials, and retain it for a time, which at least indicates some reasonable abilities for acquisition, retention and retrieval. She recalled six the words [sic] on the first trial, seven of the words on the second trial, and eight of the words on the third and final trial. On the recall trial, administered after a short period of additional interviewing, she managed to recall all eight of the words.

(*Id.*) Dr. Bowers assessed that Plaintiff's long term memory seemed to be adequate and that she appeared to be a reasonable historian. (*Id.*)

Regarding "Diagnosis, Prognosis, and Capacity," Dr. Bowers

noted that Plaintiff's difficulties dated back at least ten or eleven years, she had Panic Disorder, Depressive Disorder NOS, Rule Out Posttraumatic Stress Disorder, and a GAF of 45.  (R. 561-62.) He found Plaintiff's prognosis difficult to determine, but not promising because of her limited educational exposure and limited development of life skills.  (R. 562.)  He recommended psychiatric follow-up, psychotherapy, and possible behavior therapy services, commenting "[e]ven with this assistance, it's uncertain if these problems can be fully resolved."  (*Id.*)  Dr. Bowers also noted that Plaintiff appeared to have reasonable social judgment and at least average abilities in calculation, it was uncertain if she would be able to manage funds in her own best interest.  (*Id.*)

In his Medical Source Statement of Ability to Do Work-Related Activities (Mental), Dr. Bowers found moderate difficulties in all categories except he found marked difficulties in Plaintiff's ability to make judgments on simple work-related decisions.  (R. 564.)  His assessment was based on Plaintiff's poor memory and panic disorder.  (*Id.*)

b.  *State Agency Consultant*

On June 30, 2009, Jonathan Rightmyer, Ph.D., completed two Psychiatric Review Techniques after reviewing the records which included Dr. Bower's consultative examination.  (R. 566-94.)  One covered the time period "to Present" (R. 566-78) and the other to the date last insured of March 31, 2008 (R. 582-94).  In the

7

latter, Dr. Rightmyer concluded there was "insufficient evidence." (R. 582, 594.)  Dr. Rightmyer completed a Mental Residual Functional Capacity Assessment on the same date.  (R. 579-81.)

In the "to Present" Psychiatric Review Technique ("PRT"), Dr. Rightmyer concluded that Plaintiff had the following medically determinable impairments: Depressive Disorder, NOS; Anxiety Disorder, NOS; and Panic Disorder.  (R. 569, 571.)  He concluded that Plaintiff had the following functional limitations found in paragraph B of listing 12.02-12.04, 12.06-12.08 and 12.10: mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  (R. 576.)  Dr. Rightmyer noted that Plaintiff had no repeated episodes of decompensation, each of extended duration.  (*Id.*)  He concluded Plaintiff had activities of daily living "good for simple routine tasks."  (R. 578.)

Dr. Rightmyer's Mental Residual Functional Capacity Assessment found that Plaintiff was moderately limited in the following areas: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions, the ability to maintain concentration for extended periods; the ability to work in coordination with or proximity to others without being destracted by them; and the ability to interact appropriately with the general public.  (R. 579-80.)  In the accompanying narrative, Dr. Rightmyer

8

opined that Plaintiff could

> perform simple, routine, repetitive work in a stable environment.  She has difficulty working with or near other employees without being distracted by them.  She can make simple decisions.  She is able to carry out very short and simple instructions.  Also, she would not require special supervision in order to sustain a work routine.  She experiences social anxiety and discomfort around strangers.  Furthermore, she can function in production oriented jobs requiring little independent decision making.  She evidences some limitations in dealing with work stresses and public contact.  Moreover, she retains the ability to perform repetitive work activities without constant supervision.

(R. 581.)  Dr. Rightmyer provided a detailed analysis of Dr. Bower's opinion, summarizing that "the evidence provided by the examining source reveals only a snapshot of the claimant's functioning and is an overestimate of the severity of her limitations. . . . The psychologist's opinion is without substantial support from the other evidence of record, which renders it less persuasive."  (*Id.*)  On this basis, Dr. Rightmyer concluded Dr. Bower's opinion could not be given great weight.  (*Id.*)

c.   *Treating Psychiatrist Medical Source Statement*

On February 23, 2010, Dr. Huang completed a Medical Source Statement.  (R. 608-10.)  He opined that Plaintiff had no limitations in her ability to understand, remember, and carry out short, simple instructions; she was slightly limited in her ability

to understand and remember detailed instructions; she was moderately limited in her ability to carry out detailed instructions; and she had a marked limitation in her ability to make judgments on simple work-related decisions.  (R. 608.)  These limitations were based on "periods of intermittent severe panic and agoraphobia."  (*Id.*)  He also found that Plaintiff was moderately limited in her abilities to interact appropriately with the public and supervisors and to respond appropriately to changes in a routine work setting, and she had marked limitations in her ability to interact appropriately with coworkers and respond appropriately to work pressures in a usual work setting.  (R. 609.)  Dr. Huang noted support for these assessments was that Plaintiff was "susceptible to anxiety with public interaction.  She has not worked in 10 years."  (*Id.*)  Dr. Huang added that Plaintiff's ability to shop was also affected ("must be accompanied") as was her ability to attend indoor events ("severe anxiety").  (*Id.*)  Dr. Huang noted that the medical/clinical findings which supported the assessment: "Mostly withdrawn to household and shops at odd hours.  Cannot attend church, sports events, etc."  (*Id.*)

## 3.   **Testimony**

Plaintiff testified at the October 22, 2012, hearing that she was employed for many years at Knouse Foods where she worked as a forklift driver until she had a panic event and then worked in a variety of jobs including picking apples on a conveyor line, and

10

mail/package deliverer.  (R. 86-98.)  She said that she was self-employed in 2005 and 2006, cleaning and refurbishing apartments between tenants, a job she could do on an "as needed" basis when she "had good days."  (R. 99-100.)

Though the timeframe is not clear, Plaintiff testified that her daughter lived in an upstairs apartment with her three children and "significant other" and Plaintiff helped with the children because her daughter had postpartum depression and a bad back.  (R. 101-02.)  Plaintiff said her daughter would lie around most of the day and her boyfriend was not much help so Plaintiff would get the oldest child off to school and have the toddler downstairs with her.  (R. 103-04.)  Regarding care of her infant grandson, Plaintiff said she had a monitor and would go upstairs to get him if her daughter did not take care of him, which was most of the time.  (R. 105-06.)  Plaintiff noted that she was doing this in July 2009 and in February 2010 her daughter was getting more ill and was admitted to a psychiatric ward because she attempted suicide.  (R. 106.)  Plaintiff said her husband helped take care of the children and had most of the responsibility if she had a bad day, which was about half the time.  (R. 107.)  Plaintiff noted that her husband was disabled in a 1992 fall off a crane truck which damaged his right side and back and he had not worked since then.  (R. 109.)

Plaintiff further testified that about a year and a half

11

before the hearing, her daughter had gotten mad at her and would not allow her to see the children because she thought Plaintiff had reported her to child services. (R. 110-11.)   During this time Plaintiff said the children would sneak down to see her and sometimes they were with her most of the day. (R. 111-12.) Eventually Plaintiff's daughter moved out and, with the help of medication, became a more responsible parent. (R. 113.)

Plaintiff said that her family has picnics about three times a year with about fifteen to eighteen people. (R. 117.) She noted that she sometimes goes into the house to get away from the crowd for "sometimes a half hour." (*Id.*)

When asked if her condition had worsened since her previous hearing in 2010, Plaintiff responded that her memory had gotten much worse and she easily forgets things. (R. 118-19.)  As examples, Plaintiff noted that she had left the water running in the sink, she could not find the TV remote when it is right where it should be, and she had gone to the market about three miles from her house and called her husband to come get her because she was afraid to drive home. (R. 119-20.)  Plaintiff said she generally went to the store about three or four times a month and her grandchildren sometimes had to help her pay the bill because she could not figure out the right amount. (R. 121.)  She also said she could no longer focus enough to read and her husband had been doing most of the cooking for almost a year because she could not

make a decent meal anymore.  (R. 124.)

Upon questioning by her attorney, Plaintiff explained that she was afraid to get in the shower because it was too small and made her feel closed in and this type of feeling had been getting worse over the preceding couple of years.  (R. 125-26.)  She said that some days she did not get dressed and just watched TV in the dark without knowing what she was watching.  (R. 126.)

Plaintiff confirmed that she had not seen a psychiatrist for almost two years because her doctor left the Wellspan practice and she could not afford to see somebody else due to lack of insurance. (R. 127.)  She also confirmed that her family doctor continued to prescribe medications which helped a little, allowing her to "maybe get up and do a few things during the day."  (R. 128.)

At the supplemental hearing held on February 20, 2013, ALJ Zanotto explained at the outset that she did not see medical evidence sufficient to support Plaintiff's testimony regarding her limitations and hoped the second hearing could focus on the noted deficiencies.  (R. 140-44.)  ALJ Zanotto also noted that she struggled to read Dr. Huang's notes and tried to put the undated notes in chronological order.  (R. 144-46.)

Plaintiff confirmed that she continued to be without insurance and she had only seen her family doctor once since June of 2012 because she had to pay out of pocket.  (R. 152-53.)  She said she had not had medical insurance at any time since March 13, 2007, and

13

had paid her psychiatrist and primary care doctor herself.  (R. 154.)

Plaintiff's attorney questioned her about her work history but the chronology is far from clear.  Plaintiff said that in 2001 when she worked at Knouse Foods about fifteen days a month she would say she could not do the job they wanted her to do because she was having a bad day and she would call off sick more than five days per month.  (R. 155-57.)  When asked by the ALJ to focus on what Plaintiff was like from 2007 when she was alleging disability, Plaintiff said she was reduced to part-time by Dr. Huang and her employer let her go.  (R. 158.)  Plaintiff added that Dr. Huang did not want her to work at all.  (*Id.*)

When asked by her attorney if she had any days that she felt better from that point on, Plaintiff responded that she had what she called "good days" where she could think a bit more clearly.  (R. 159.)  She said she could not estimate how many good days she had in a month.  (R. 159-60.)  Plaintiff said she stayed in her pajamas a lot and her husband had to encourage her to bathe.  (R. 166.)

Plaintiff reported that Dr. Wampler continued to prescribe the medications first prescribed by Dr. Huang but the medications just kept her from crying or hiding all day.  (R. 166-67.)

Plaintiff's husband, Mark Stoddard, also testified at the February 20, 2013, supplemental hearing.  (R. 171.)  He verified

14

that Plaintiff had not worked outside the home since 2007 and she did not like to leave the house.  (R. 173.)  He said she does very little during the day, adding that "she tries, but she messes everything up," including doing dishes and laundry.  (R. 174.)  Mr. Stoddard testified that Plaintiff had a "big problem" being around people other than family.  (*Id.*)  By way of example, he noted that she would not go into a store if there were a lot of cars, she would rarely go to ball games or things like that, and that she did not go to church anymore.  (R. 175.)  Mr. Stoddard's testimony indicated that Plaintiff did not take care of personal hygiene and it was sometimes as long as three weeks that she would go without a shower or bath--she would "wash up" and change her clothes but not bathe.  (R. 175-76.)  He estimated that had been going on since 2005 or 2006.  (R. 176.)

When asked by Plaintiff's attorney if there was anything else, Mr. Stoddard responded that Plaintiff needed to get back to going to a doctor.  (R. 178.)  Regarding care of the grandchildren, he said that his wife thought she was taking care of them but "they were basically taking care of her and they still do to this day." (R. 178-79.)  He confirmed that she would get them something to eat and get them on the bus some days.  (R. 180.)  Regarding household chores, Mr. Stoddard said she did not do much of anything except watch TV and she would watch the same show several times without remembering it.  (*Id.*)  He added that she helped with outside

15

chores and put wood in the wood stove in the basement when needed. (R. 181.)

Mr. Stoddard testified that the biggest problem his wife would have if she had a job was her medicine and the way it affects her, "like the sleeping or the forgetting stuff or . . . doing things[,] . . . taking care of her body." (R. 182.) He questioned whether it was the disease or the medicine, but he did not think she could work without somebody helping her with hygiene and transportation issues, confirming that it would have to be a job where she did not have to interact with people and she would need help staying on task. (R. 183-84.) Mr. Stoddard also said Plaintiff's condition had deteriorated since Dr. Huang moved away. (R. 186.)

**4.   ALJ Decision**

In her March 1, 2013, Decision, ALJ Zanotto made the following Findings of Fact and Conclusions of Law:

> 1.   The claimant meets the insured status requirements of the Social Security Act through March 31, 2008.
>
> 2.   The claimant has not engaged in substantial gainful activity since March 13, 2007, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).
>
> 3.   The claimant has the following severe impairments: panic disorder with agoraphobia and depressive disorder (20 CFR 404.1520(c) and 416.920(c)).
>
> 4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part

16

> 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels. In addition, the claimant retains the mental capacity for simple unskilled work tasks requiring only occasional judgment, and no contact with the public.
>
> 6. The claimant is capable of performing past relevant work as a mall worker II. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).
>
> 7. The claimant has not been under a disability, as defined in the Social Security Act, from March 13, 2007, through the date of this decision (20 CFR 404.1520(f) and (g) and 416.920(f) and (g)).

(R. 16-23.)

Under her step four analysis, ALJ Zanotto found "in the alternative," that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (R. 22.) The ALJ noted that her findings on this matter were based on the testimony of a vocational expert. (R. 23.)

Other relevant portions of the Decision will be referenced in the Discussion section of this Memorandum.

17

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[3]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

---

[3]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step four of the sequential evaluation process when the ALJ found that Plaintiff could perform past relevant work as a mail worker II. (R. 22.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion. *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted). The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence. If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.

1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Comm'f of Soc. Sec.*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However,

even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."); *see also Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) (a remand is not required where it would not affect the outcome of the case.).  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision.  *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that the Acting Commissioner's decision should be reversed or remanded for the following reasons: 1) the ALJ made the same findings in her second decision as she made in her first decision and failed to follow the instructions of the Appeals Council; 2) the ALJ failed to follow the treating physician rule regarding the opinion of Gene Huang, M.D.; and 3) the ALJ

erred in finding that Plaintiff and her husband were not credible
(Doc. 16 at 12-13).

**A.  *Compliance with Appeals Council's Order***

Plaintiff first argues the ALJ erred when she made the same
findings in her second decision as she did in her first decision
and failed to completely follow the Appeals Council Order.  (Doc.
16 at 15.)  Defendant responds that the ALJ complied with the
Appeals Council's Order.  (Doc. 19 at 13.)  The Court concludes
Plaintiff has not shown error on the basis alleged.

The Appeals Council directed the following:

> Upon remand, the Administrative Law Judge
> will:
>
> • Give further consideration to the
>   claimant's [RFC] and provide appropriate
>   rationale with specific references to
>   evidence of record in support of the
>   assessed limitations. . . . In so doing,
>   [g]ive further consideration to the
>   nontreating source opinion of Thomas
>   Bowers, Ph.D. (Exhibit 7F), and the
>   treating source opinion of Gene Huang,
>   M.D. (Exhibit 13F), . . . and explain
>   the weight given to such opinion
>   evidence. . . .
>
> • Adhere to the standards set out in 20
>   CFR 404.1565 and 416.965 and Social
>   Security Ruling 82-61, 82-62 and 96-8p
>   for any conclusions reached about past
>   relevant work.  The record must reflect
>   that the claimant's past work activity
>   meets the duration and substantial
>   gainful activity guidelines to be
>   considered past relevant work.
>
> • If warranted by the expanded record,
>   obtain supplemental evidence from a

23

> vocational expert to clarify the effect
> of the assessed limitations on the
> claimant's occupational base (Social
> Security Ruling 85-15). . . .
>
> In compliance with above, the Administrative
> Law Judge will offer the claimant an
> opportunity for a hearing, take any further
> action needed to complete the administrative
> record and issue a new decision.

(R. 209-10.)

Plaintiff specifically asserts the following: 1) the ALJ "simply changed the weight she gave to Dr. Huang's opinion but made no further effort to explain why she rejected the opinion"; 2) the ALJ "still found the Plaintiff could perform her past relevant work only this time identified the work as a mail sorter"; and 3) the ALJ failed to express why she rejected the marked limitations expressed by Dr. Huang.  (Doc. 16 at 16-17.)

**1.   Treating Psychiatrist Opinion**

Plaintiff contends the ALJ only changed the weight assigned to Dr. Huang's opinion without making an effort to explain why she rejected the opinion.  (Doc. 16 at 16.)  However, a review of the Decision shows that ALJ Zanotto complied with the Appeals Council's directive to give further consideration to his opinion and correct her original errors of not indicating what "appropriate weight" meant and not explaining why the limitations assessed by Dr. Huang were not adopted (R. 208-09).

ALJ Zanotto provided a detailed review of Dr. Huang's February 2010 Medical Source Statement and specifically addressed the

24

limitations indicated by Dr. Huang.  (R. 20-21.)  She first
explained why she found certain restrictions inconsistent with the
record:

> [T]he undersigned finds that these
> restrictions are inconsistent with
> psychiatric progress notes showing that the
> claimant denied panic attacks in April 2011,
> reported being able to travel, and had fair
> sleep pattern.  She also reported being able
> to go out when accompanied, presented with
> cooperative attitude, normal speech and motor
> activity, organized thought process, and good
> insight and judgment (Exhibit 14).  In
> addition, a June 2011 progress note from
> Adams-Cumberland Family Medicine shows that
> the claimant reported controlled anxiety,
> denied suicidal ideation, was tolerating
> medications without side effects and
> requested that her primary care physician,
> Dr. Wampler, to assume control of her
> medication since her psychiatrist was
> leaving.  The claimant also reported that her
> symptoms of anxiety were well controlled in
> June 2012, at which time she also denied
> medication side effects.  The claimant also
> reported exercising daily and trying to cut
> back on her smoking (Exhibit 15F).

(R. 20.)  After further discussion of discrepancies between
Plaintiff's reported limitations and evidence of record, ALJ
Zanotto summarized her findings in explaining the weight attributed
to the opinion, concluding that

> the marked restrictions are somewhat
> overstated in comparison to the psychiatric
> records showing that the claimant denied
> frequent panic attacks, presented as
> cooperative and with normal speech, motor
> activity and mood, and denied suicidal
> ideation, delusions or hallucinations
> (Exhibit 14F).  As previously discussed in
> this Decision, the undersigned has restricted

> the claimant to occupations requiring no more
> than occasional judgments and no contact with
> the public.  The claimant's mental health
> symptoms are managed by her primary care
> physician who basically prescribes
> medication.  The claimant reports that her
> anxiety is well controlled (Exhibit 15F).
> Therefore, the opinion of Dr. Huang is
> accorded little weight.

(R. 21.)

The foregoing excerpts from the March 1, 2013, Decision clearly show that, as directed by the Appeals Council (R. 208-09), ALJ Zanotto provided a detailed explanation, including citation to the record, for her reasons why all the limitations indicated by Dr. Huang were not included in the RFC.  (R. 20-21.)

With the broad statement that the ALJ "simply changed the weight she gave to Dr. Huang's opinion but made no further effort to explain why she rejected that opinion" (Doc. 16 at 16), Plaintiff does not undermine the ALJ's analysis.  However, in her somewhat disjointed discussion of the propriety of the RFC assessment, Plaintiff notes that "Dr. Huang's opinion suggests that the Plaintiff's marked limitations were during her 'periods of intermittent severe panic and agoraphobia.'  Therefore, according to Dr. Huang, the Plaintiff may have an acceptable level of functioning at times but would have the marked limitations when she had panic attacks."  (Doc. 16 at 17.)  This statement neither shows that the ALJ did not comply with the Appeals Court's Order nor does it point to error in the ALJ's analysis of Dr. Huang's opinion.

26

Regarding the latter, assuming Plaintiff had "intermittent severe panic and agoraphobia" at some time when she was treated by Dr. Huang prior to his February 2010 opinion, the medical evidence supports a conclusion that Plaintiff did not thereafter exhibit or report such events to her medical providers.  For example, the record indicates, and Plaintiff recognized, that her last severe panic attack was in May 2009 (Doc. 16 at 10 (citing R. 615)) and her primary care physician, Dr. Wampler, reported at both Plaintiff's 2011 and 2012 annual visits that Plaintiff felt her anxiety problem was controlled and she was tolerating the medications well with no side effects.  (R. 623, 630.)  Thus, even if Plaintiff is correct that "Plaintiff would not necessarily have abnormal findings all the time . . . and marked limitations may only be when she has panic attacks and she may be able to function satisfactorily at other times" (Doc. 21 at 2), it does not follow that findings of marked limitations are entitled to controlling or significant weight when medical evidence does not show that Plaintiff had experienced such an event for several years prior to the decision.

## 2.  **Past Relevant Work**

Plaintiff also asserts that the ALJ did not comply with the Appeals Council's Order regarding her past relevant work.  (Doc. 16 at 16.)  Defendant maintains that, even if the ALJ erred on the basis alleged, the error would be harmless because the ALJ made an

alternative step five finding and identified other jobs which existed in significant numbers that Plaintiff could perform.  (Doc. 19 at 17.)  In her reply brief (Doc. 21), Plaintiff does not argue otherwise.

The Supreme Court explained the operation of the harmless error doctrine in *Shineski v. Sanders*, 556 U.S. 396, 409 (2009), a case which concerned review of a governmental agency determination. The Court stated: "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."  *Id.*  In such a case, "the claimant has the 'burden' of showing that an error was harmful."  *Id.* at 410. The Third Circuit Court of Appeals applied *Shineski* to a Social Security case in *Woodson v. Comm'r of Soc. Sec.*, 661 F. App'x 762, 766 (3d Cir. 2016) (not precedential), quoting *Shineski* for the proposition that "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."  *Woodson* also relied on *Rutherford*, 399 F.3d at 553 for the proposition that a remand is not required where it would not affect the outcome of the case.  661 F. App'x at 766.

Here the record supports Defendant's argument that the alleged step four error would be harmless because ALJ Zanotto made an alternative step five finding which Plaintiff does not refute. (Doc. 19 at 17; R. 22-23.)  Because Plaintiff has the burden of showing harm and has not done so, the Court need not further

28

address this basis for reversal or remand.

### 3.   <u>Residual Functional Capacity</u>

In the Appeals Council Order section of her supporting brief, Plaintiff seems to generally assert that the ALJ has not corrected flaws noted in the Appeals Council's Order, including that the RFC findings were deficient.  (Doc. 16 at 18-19.)  Though the brief is not a model of clarity or organization, the Court will briefly review assertions made.

Plaintiff states that the RFC findings are inconsistent with the medical evidence accepted by the ALJ.  (Doc. 16 at 18.)  First, the Court rejects Plaintiff's conclusions based on the premise that Dr. Rightmyer's moderate limitations are similar to Dr. Huang's marked limitations because the definition of these terms is significantly different: with a moderate limitation, "the individual is still able to function satisfactorily"; with a marked limitation the "ability to function is severely limited but not precluded."  (*See* R. 608.)  Second, Plaintiff's argument that the RFC did not account for the moderate limitations in concentration, persistence and pace assessed in the opinion of Dr. Rightmyer which was given significant weight by the ALJ (*id.* at 19), is not persuasive.  Plaintiff's blanket statement that failure to include moderate limitations in concentration, persistence and pace in the RFC and hypothetical questions to the vocational expert requires remand (Doc. 16 at 19-20 (citing *Johnson v. Commissioner of Soc.*

*Sec.*, 529 F.3d 198, 206 (3d Cir. 2008)), suggests that there is a bright-line rule on this issue.  As argued by Defendant (Doc. 19 at 19-20), Third Circuit caselaw and decisions of this Court clearly indicate otherwise.  *Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167, 168-69 (3d Cir. 2014); *McDonald v. Astrue*, 293 F. App'x 941, 946 n.10 (3d Cir. 2008); *Menkes v. Astrue*, 262 F. App'x 410, 412 (3d Cir. 2008); *Wright v. Colvin*, Civ. A. No. 3:15-CV-102, 2015 WL 4530384, at *16 (M.D. Pa. July 27, 2015)).  Plaintiff does not further develop this argument in her reply brief.  (*See* Doc. 21.) Therefore, the Court concludes Plaintiff has not shown error on the basis alleged.

**B.   *Treating Physician Rule***

Plaintiff maintains the ALJ failed to follow the treating physician rule in assessing Dr. Huang's opinion.  (Doc. 16 at 20.) Defendant responds that the ALJ articulated valid reasons for discounting the opinion.  (Doc. 19 at 23.)  The Court concludes Plaintiff has not shown that this alleged error is cause for reversal or remand.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.  *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).  This principal is codified at 20 C.F.R. §§

404.1527(c)(2) and 416.927(c)(2), and is widely accepted in the
Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see
also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986).  The regulations
address the weight to be given a treating source's opinion: "If we
find that a treating source's opinion on the issue(s) of the nature
and severity of your impairment(s) is well-supported by medically
acceptable clinical and laboratory diagnostic techniques and is not
inconsistent with the other substantial evidence in your case, we
will give it controlling weight." 20 C.F.R. §§ 404.1527(c)(2),
416.927(c)(2).[4]  "A cardinal principle guiding disability

_____

[4] 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) state in
relevant part:

> Generally, we give more weight to opinions from
> your treating sources, since these sources are
> likely to be the medical professionals most
> able to provide a detailed, longitudinal
> picture of your medical impairment(s) and may
> bring a unique perspective to the medical
> evidence that cannot be obtained from the
> objective medical findings alone or from
> reports of individual examinations, such as
> consultative examinations or brief
> hospitalizations. If we find that a treating
> source's opinion on the issue(s) of the nature
> and severity of your impairment(s) is well-
> supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not
> inconsistent with the other substantial
> evidence in your case record, we will give it
> controlling weight. When we do not give the
> treating source's opinion controlling weight,
> we apply the factors listed in paragraphs
> (c)(2)(i) and (c)(2)(ii) of this section, as
> well as the factors in paragraphs (c)(3)
> through (c)(6) of this section in determining
> the weight to give the opinion. We will always

31

eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); *see also Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008).  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

As discussed in the Appeals Court Order section of this Memorandum, ALJ Zanotto thoroughly analyzed Dr. Huang's opinion and provided a reasoned basis for assigning it little weight.  Contrary to Plaintiff's assertion that the ALJ did not comply with 20 C.F.R. § 404.1527, ALJ Zanotto found that Dr. Huang's restrictions were not consistent with other medical evidence, specifically citing

give good reasons in our notice of
determination or decision for the weight we
give your treating source's opinion.

numerous bases for the conclusion.[5]   (R. 20-21.)   To the extent
Plaintiff points to support from Dr. Bower's opinion regarding a
marked limitation in the ability to make judgments on simple work-
related decisions (Doc. 16 at 21), ALJ Zanotto explained her
assessment of that opinion (R. 21) and Plaintiff's series of
conclusory statements do not show error.  Importantly, no rule
suggests that the assignment of "little weight" to an opinion means
that the opinion is totally devoid of support.

　　　　Further, the point on which the opinions agree does not show
error in the overall weight assigned Dr. Huang's opinion or the
ALJ's RFC finding.   On the contrary, in another section of her
opinion, Plaintiff asserted that a marked limitation in the ability
to make judgments on simple work related decisions "limited [her]
to making accurate, appropriate and correct judgments only one
third of the workday at most" (Doc. 16 at 19), and Plaintiff
acknowledged the ALJ's RFC finding that she could occasionally make
judgments in the work setting by definition meant that the ALJ
found she could make judgments up to one third of the workday (*id.*
(citing HA 1151-BK)).   Thus, Plaintiff concedes that there is no
inconsistency between the limitations in making judgments on work-

---

　　　　[5]　　To the extent Plaintiff suggest an ALJ must discuss all
factors set out in relevant regulations, there is no such
requirement.  Rather, an ALJ should analyze applicable factors in
order to provide sufficient findings for judicial review.  *Centano
v. Comm'r of Soc. Sec.*, Civ. No. 09-6023, 2010 WL 5068141, at *8
(D.N.J. Dec. 6, 2010).  The Court concludes the ALJ has done so
here.

related decisions opined by Dr. Huang and Dr. Bowers and the ALJ's finding that Plaintiff could perform simple unskilled work tasks requiring only occasional judgment.  (R. 18, 564, 608.)

The foregoing analysis undermines other assertions made by Plaintiff in support of her claimed error regarding the treating physician rule.  Her statement that "it appears that the Administrative Law Judge rejected the opinion of Dr. Huang and other treating sources simply because Plaintiff allegedly cared for her grandchildren" (Doc. 16 at 22), ignores the many reasons ALJ Zanotto cited as the bases for her assessment of the opinion.  (*See* R. 20-21.)  Plaintiff's statements that "the only medical evidence cited as inconsistent with the opinion of Dr. Huang was the opinion of the nonexamining state agency physician that the Plaintiff's impairments would not preclude her from meeting the basic mental demands of competitive work on a sustained basis" and "opinions from nonexamining state agency doctors are not a sufficient basis to reject the opinion of a treating physician (Doc. 16 at 22, 23) are similarly deficient in that, as discussed above, the ALJ pointed to many reasons for assigning Dr. Huang's opinion less than controlling weight.[6]  (R. 20-21.)

_____

[6]  Plaintiff notes that Dr. Rightmyer completed two PRTs on the same date (one with the conclusion set out in the text and the other finding insufficient evidence to evaluate the the claim) and the ALJ failed to explain why this was so.  (Doc. 16 at 22.)   The Court finds no inconsistency in that one PRT addressed the period to the date of the PRT, June 30, 2009 (R. 566) and a fair inference is that the other addressed the period to the date last insured of

34

**C.   Credibility**

Plaintiff's final claimed error is the ALJ's finding that she and her husband were not credible.  (Doc. 16 at 23.)  Defendant responds the ALJ reasonably discounted their subjective statements. (Doc. 19 at 31.)  The Court concludes Plaintiff has not shown the alleged error is cause for reversal or remand.

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.'"  *Coleman v. Commissioner of Social Security*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)).  "Credibility determinations are the province of the ALJ and should only be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873 (3d Cir. 1983)).

The Social Security Regulations provide a framework within which a claimant's subjective complaints are to be considered.  20 C.F.R. §§ 404.1529, 416.929.  First, symptoms such as pain, shortness of breath, and fatigue will only be considered to affect

---

March 31, 2008 (R. 582).  The inference is based on the last page of the PRTs: in the former Dr. Rightmyer stated in part "Currently: ADLs good for simple routine tasks" (R. 578); in the latter, he stated "DLI 3/31/08: insufficient evidence" (R. 594).

a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b).  Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work.  *Id.*  In so doing, the medical evidence of record is considered along with the claimant's statements.  *Id.*

At the time of the ALJ Decision in this case, Social Security Ruling 96-7p provided guidance regarding the evaluation of a claimant's statements about his or her symptoms:[7]

---

[7]  SSR 96-7p was superseded by SSR 16-3p effective March 16, 2016.  SSR 16-3p, 2016 WL 1119029, at *1 (S.S.A.).  SSR 16-3p eliminates the word "credibility" from the sub-regulatory policy because the regulations do not use the term.  *Id.*  The Seventh Circuit explained the change in *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016):

> Recently the Social Security Administration announced that it would no longer assess the "credibility" of an applicant's statements, but would instead focus on determining the "intensity and persistence of [the applicant's] symptoms." . . . The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence.

*Id.*  Substantively, SSR 16-3p's guidance concerning the evaluation

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements.  In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true.  When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p, 1996 WL 374186, at *4 (S.S.A.).  The ruling adds that "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."[8]  SSR 96-7p, 1996 WL 374186, at

---

of subjective symptoms in disability claims is largely consistent with the policies set out in SSR 96-7p regarding the assessment of the credibility of an individual's statements.  *See*, *e.g.*, *Sponheimer v. Comm'r of Soc. Sec.*, Civ. No. 15-4180, 2016 WL 4743630, at *6 n.2 (D.N.J. Sept. 8, 2016).  In this case, ALJ Zanotto issued her Decision prior to the effective date of SSR 16-3p so her obligation was to follow the guidance set out in SSR 96-7p.  Therefore, the Court references the standards set out in SSR 96-7p in this Memorandum.

[8]  Factors which may be relevant in the evaluation of symptoms include: 1) activities of daily living; 2) the location, duration, frequency and intensity of the pain or other symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness and side effects of medications taken to alleviate symptoms; 5) treatment received other than medication intended to relieve pain or other symptoms; 6) other measures used for pain/symptom relief; and 7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-vii); SSR 96-7, 1996 WL 374186, at *3; SSR 16-3p, 2016 WL 1119029, at *7.

*5.

Relevant guidance regarding the ALJ's obligation to make a specific credibility finding is quite detailed:

> The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility.  The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.  It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave the individual's statements and the reasons for that weight.  The documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

SSR 96-7p, 1996 WL 374186, at *4.

Here ALJ Zanotto supported her determination that Plaintiff and her husband were not entirely credible with citation to evidence of record and sufficient specificity for the Court to review the reasons for the weight attributed.   (*See* R. 19-21.) Following her summary of Plaintiff's testimony and that of her husband regarding limitations caused by her impairments, ALJ Zanotto found that the statements were "not entirely credible for

38

the reasons explained in this decision." (R. 19.) In the next paragraph, the ALJ began her assessment of the symptoms.

> In terms of the claimant's alleged symptoms, psychiatric progress notes show that while the claimant reported not doing any better and feeling irritable and anxious, she also reported only "periodic" depression and denied panic or agoraphobia. It was also noted that the claimant's affect seemed brighter, that she continued to deny agoraphobia or panic, was coping well, appeared to have an even mood, was sleeping "okay" and reported enjoying spending time with her grandchildren (Exhibits 3F and 5F). Subsequently, the claimant reported ongoing stress and anxiety secondary to issues involving her daughter (Exhibit 5F). . . . Also, progress notes from November 2009 and February 2010 show that the claimant reported increased stress with her husband's disability and with caring for her grandchildren. She reported tolerating public places with no symptoms of panic (Exhibit 12F). The claimant appears to be well-maintained on her medication regimen as no specific changes were made with the exception of a decrease in her Paxil dosage. In May 2010, the claimant was described as having normal motor activity and speech, a euthymic mood, organized and logical thought process, denied delusions, hallucinations and suicidal ideations, demonstrated good insight and judgment, and had a cooperative attitude (Exhibit 12F).

> . . . .

> The undersigned also notes for the record that while the claimant reports that she spends her day lying around and watching television, the record indicates that the claimant cared for her grandchildren and her disabled husband. In addition, the claimant's symptoms appear to be well-controlled with medication as the claimant presents with rather limited symptomatology.

39

> She was also able to keep appointments with
> her treating psychiatrist and was compliant
> with her medications (Exhibit 15F).  As for
> the alleged medication-induced side effects,
> recent progress notes fail to establish that
> the claimant made related complaints to Dr.
> Huang, her treating psychiatrist or to Dr.
> Wampler, who was managing the claimant's
> psychotropic medications (Exhibit 15F).  The
> record shows that the claimant's medications
> were previously adjusted to alleviate
> reported side effects, but there is no
> indication that she has recently made related
> complaints.

(R. 19-20.)

Importantly, with the claimed credibility error, Plaintiff does not refute evidence cited by the ALJ.  Rather, Plaintiff first repeats statements made by her and her husband concerning her limitations, focusing on issues related to poor memory, poor concentration, fear of going out in public and social phobia, and loss of interest in taking care of herself.  (Doc. 16 at 23-24.) Included are Mr. Stoddard's assessment that one of Plaintiff's biggest problems was the side effects of medications which caused her to sleep a lot and forgetfulness and the problems he thought would be associated with potential jobs.  (*Id.*)

Plaintiff then asserts that subjective testimony is supported by the opinions of record, including marked limitations found by Dr. Huang and Dr. Bowers and the moderate limitations found in their opinions as well as that of Dr. Rightmyer.  (*Id.* at 25-26.) As discussed previously, the ALJ properly discounted the opinion of Dr. Huang.  To the extent the Court concluded that marked

40

limitations in making judgments on simple work-related decisions found in the opinions of Dr. Huang and Dr. Bowers do not conflict with an ability to perform simple unskilled work requiring only occasional judgment and no contact with the public, *see supra* pp. 33-34, such limitations do not support statements which suggest that Plaintiff is unable to engage in substantial gainful activity. Plaintiff's similar argument regarding the moderate restrictions found in all opinions is also unavailing in that, as noted previously, "moderate" means "still able to function satisfactorily" (R. 608) and, therefore, moderate limitations do not support subjective statements indicating that Plaintiff is unable to do so.

Plaintiff's argument that the ALJ did not specifically comply with the requirements of SSR 96-7p is not persuasive in that the ALJ looked at Plaintiff's activities of daily living, subjective allegations made to treating physicians and during testimony, treatment received, the effectiveness and side effects of medications taken to alleviate symptoms, and opinions from treating and examining physicians (R. 19-21).  SSR 96-7, 1996 WL 374186, at *3; *see also* 20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-vii); SSR 16-3p, 2016 WL 1119029, at *7.

In sum, Plaintiff's conclusion that the ALJ "simply rejected the Plaintiff's testimony and that of her husband as not consistent with the record as a whole" (Doc. 16 at 28) is not an accurate

41

portrayal of the record review and analysis conducted by ALJ Zanotto.  While there is certainly a disconnect between the limitations alleged by Plaintiff and her husband during their hearing testimony and medical findings made by treating doctors, which at least in part were based on Plaintiff's subjective complaints to the providers, such a disconnect does not point to error on the part of the ALJ.  Rather, the Decision is supported by substantial evidence and, therefore, must be affirmed.

### V. Conclusion

For the reasons discussed above, we have found all claimed errors to be without merit.  Therefore, Plaintiff's appeal of the Acting Commissioner's denial of benefits (Doc. 1) is denied.  An appropriate Order is filed simultaneously with this Memorandum.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: March 9, 2017